[Civ. No. 15916.   First Dist., Div. One.   Aug. 27, 1954.]

ESTHER MacLEAN, Appellant, v. CITY AND COUNTY OF SAN FRANCISCO et al., Respondents.

264

Fitz-Gerald Ames, Sr., and Harold A. Galloway for Appellant.

Dion R. Holm, City Attorney, and George E. Baglin, Deputy City Attorney, for Respondent City and County of San Francisco.

Alexander, Bacon & Mundhenk for Respondents Barsotti and Bernardini.

Dana, Bledsoe & Smith and Wilbur J. Russ for Respondent D'Amico.

Bronson, Bronson & McKinnon for Respondent Filippi.

BRAY, J.—From judgments in favor of defendants respectively, entered after motions for nonsuit were granted, plaintiff appeals on a settled statement.

The question presented is the sufficiency of the evidence to show negligence upon the part of the respective defendants.

### General Facts

The facts referring to the negligence of the particular defendant will be discussed later, and, as we are required to do in nonsuits, the facts and the reasonable inferences therefrom most strongly in favor of plaintiff will be given. The action is for injuries claimed to have been sustained by plaintiff while getting off a bus operated by defendant City and County of San Francisco. At Scott and Chestnut Streets there is a regular bus loading and unloading zone. At this time it was occupied by another municipal bus. Therefore, plaintiff's bus stopped to unload about 3 or 4 feet to its rear. Due to the presence of a private automobile parked at the curb, the bus could not stop in a position parallel to the curb but slanted in toward the gutter in such manner that the point from which plaintiff alighted was 5 to 8 feet from the curb, thus forcing her to walk that distance to reach the sidewalk. While so doing she slipped upon some slippery, moist substance which had collected in the gutter at that point. She fell to the pavement and sustained serious injuries. The material in the gutter was described variously as slag, stucco, mortar and cement, grayish muck, stucco or plaster underneath and dirt, debris and water on top, white slimy substance, and wet plaster. Up the hill and approximately one block away at the northeast corner of Scott Street and Lombard Street, a building was undergoing alterations. There was testimony

that there were no other construction jobs in the vicinity. There was testimony that this white and gray substance was deposited along the edge of the curb on the east side of Scott Street from the point at which it was dumped into the gutter at the building site down to the place of the accident. Near the bus zone there was a concentration of this substance. It was on this substance that plaintiff slipped.

Under the evidence, the jury could have reasonably found that this substance came from the area of the construction work.

### THE BUILDING CONTRACTORS

(a) *The Plasterer.*

There were three sets of contractors sued in the action. We will first consider the evidence as relating to defendant D'Amico, to whom the general contractors had subcontracted the plastering work. While the repairs were being made D'Amico and his employees mixed their plaster by the use of both a mixing machine and a mortar box. This box was in the street. It was the custom to clean up the job at the end of each day's work. So far as the mortar box was concerned, this was done by scraping the box dry, putting the material into sacks or pails, then sloshing clean water in the box and dumping the result of this mixture into the gutter. On the afternoon of the accident they mixed stucco in the box and washed the box in the above mentioned fashion. The mixing machine was washed out in the street. It would be allowed to sit for awhile, thus allowing the moisture in the mixture to come to the top and would be poured out into the gutter. The remaining material would be put in or under a sack or under a scaffolding. Then water would be hosed into the machine, and after the machine had run for a few minutes, the resultant mixture would be dumped into the gutter. This mixture was grayish in color or light gray. The last plastering performed by D'Amico was on August 15th (the accident occurred August 16th) but stucco was mixed in the mortar box the latter day and it was cleaned and taken from the job. D'Amico's hod carrier and D'Amico testified that the machine was removed from the job four days before the accident. However, the bricklayer's hod carrier testified he saw the machine being cleaned and the contents dumped into the gutter on the 16th. Both D'Amico and his hod carrier testified that the material washed by them into the gutter would completely harden within 12 hours. The exact hour when the washing was done on the 16th does

not appear but a reasonable inference is that it was some time during the afternoon, either around 2 or 4 o'clock. The accident occurred about 8 p. m. The jury could reasonably have inferred that the material washed into the gutter with water was still soft at that time. D'Amico's hod carrier testified that the material used the day of the accident was waterproofing cement wash used in "whitewashing the building." He also referred to it as a ready mixed mortar which was white. The material on which plaintiff slipped was described as white and gray.

Defendant D'Amico contends that the evidence fails to disclose any negligence upon his part, primarily because there was no evidence of the "amount or viscosity of any material dumped by the defendant" to show that it would run a distance of some 200 feet to the point of the accident, and that there is no evidence to justify a finding that defendant D'Amico should have foreseen the possibility of injury from his acts. However, as shown, the evidence would justify an inference that a sufficient quantity of the gray and white material from D'Amico's mortar box and machine was washed into the gutter, either alone or with that also washed into the gutter by the bricklaying contractor, as hereafter discussed, to reach the spot where plaintiff slipped, and that such material had not hardened sufficiently as not to cause plaintiff to slip. ▮ Certainly a person washing slippery material into the gutter of a city street is presumed to foresee that it will run downhill and may cause trouble to a person rightfully using that portion of the street where the material deposits. As will be discussed later, the court should have permitted plaintiff to introduce certain provisions of the municipal code, one of which provisions at least (§ 4104) the jury could have found D'Amico violated. ▮ The judgment of nonsuit in favor of D'Amico was improperly granted.

(b) *The Bricklayer.*

▮ The general contractor sublet the bricklaying work to defendant Filippi. He and his employees mixed their mortar in a mortar box in the street next to the gutter and just uphill from the plasterer's equipment. Customarily the bricklayers clean their equipment at the end of the day's work. The mortar box was cleaned by scraping it with a square pointed shovel. If there was too much muck it was washed down with a hose but not where it would stain the street. The

material he was using was white sand and white cement. Filippi's hod carrier testified that on this job he did not have to use a hose on the mortar box because he did not make enough mortar to bother washing it out. At 2 p. m. he made his last mix. What was left of the mortar in the box he scraped out of the box and put in a bucket. He then put the box in a truck which later took it away. If by some chance he had washed out the box or run water over it, and thrown it in the gutter, it would have been around 3:30 p. m. at the latest, and by 8 o'clock the mortar would be hard and would not form a slippery or slimy substance on the street. The hod carrier did testify that if there was enough mortar in the box he would use a hose and hose out the muck, and that while he very seldom in mixing mortar slopped any material on the street, if he did he would gather up that material and put it in his hod. Differing from the D'Amico situation, there is no testimony that Filippi's employees washed or dumped any material on the street that afternoon. Plaintiff's contention that the jury might have inferred that they did is based entirely upon the fact that some of the material where plaintiff slipped was white and Filippi's mortar was white, plus the fact that on occasions Filippi's hod carrier had hosed some material into the street. However, the white material at the point of the accident is explained by the evidence relating to D'Amico. In the face of the direct testimony to the effect that no mortar came out of the box that day, to conclude that it did would not be indulging in a reasonable inference but in pure guesswork. True, the jury could disregard the Filippi witnesses' testimony as to the small amount of mortar mixed that day and that none was washed into the street. But if it did, there still would be no evidence to the contrary. The judgment of nonsuit in favor of Filippi was properly granted.

(c) *The General Contractors.*

█ Defendants Barsotti and Bernardini were the general contractors. There is no contention that they spilled any substance into the street. Their claimed liability is based upon the exception to the general rule that a subcontractor is an independent contractor for whose negligence a general contractor is not responsible, namely, the doctrine of *respondeat superior* for the negligence of their subcontractors resulting in the creation of a public nuisance in violation of the contractor's nondelegable duty to maintain safe and unobstructed public ways. (See *Colgrove* v. *Smith,* 102 Cal. 220 [36 P. 411,

27 L.R.A. 590] ; *Luce* v. *Holloway*, 156 Cal. 162 [103 P. 886] ; *Barrabee* v. *Crescenta Mutual Water Co.*, 88 Cal.App.2d 192 [198 P.2d 558].) These defendants as agents for the owner obtained from the city a required street space permit. The owner obtained the necessary building permit. On the first mentioned permit was printed "Gutters and waterways must be kept clear."

As we have held that there was evidence from which the jury could have found the plastering subcontractor liable for negligence in dumping material into the gutter, it becomes necessary to determine whether such act constitutes a public nuisance so as to make applicable to the general contractors the above principle of law. Upon this subject, two of the provisions of the municipal code which the court refused to admit would be most relevant.

Section 310 requiring a permit for temporary occupancy of a street provides, in part : "All sand, dirt or other materials, shall be prevented from being blown or moved to other parts of the street or from interfering with other property use. Gutterways shall not be obstructed."

Section 4104 provides : "Preparation of mortar or concrete on public property : The mixing of mortar or concrete on public property shall be done in a mechanical mixer or in a tight box in such a manner as to prevent dripping or splashing on public property."

Both of these sections should have been admitted, as there was evidence from which the jury could have found that their provisions had been violated. Had the jury so found, then it could have also found that such violation constituted a public nuisance, thereby making applicable as against the general contractors the above mentioned principle of law. In view of the nuisance feature of the evidence, cases on the doctrine of collateral nuisance such as *Frassi* v. *McDonald*, 122 Cal. 400 [55 P. 139, 772], *Schmidlin* v. *Alta Planing Mill Co.*, 170 Cal. 589 [150 P. 983], and the Restatement, Torts, section 426, on the same subject are not applicable.

Section 4101 providing that pedestrians shall not be endangered by the work is by its terms limited to pedestrians on the street that abuts the property line. Section 4103 concerning restrictions to storage on public property prohibits the obstructing of any catch basin or manhole so as to interfere with the free flow of water in any street gutter. These sections are not relevant to any of the issues in this case and were properly denied admittance into evidence.

CITY AND COUNTY OF SAN FRANCISCO

The area where the bus zone is located is a business district. The whole block is a parking meter zone for autos except for the bus zone which is at the corner and is about 50 feet long. Because of the preceding bus being in the zone and the automobiles parked behind it, plaintiff's bus was pulled to within 3 or 4 feet of the first bus, nosed in at an angle as close to the curb as conditions would permit. Its right front door, from which plaintiff along with other passengers alighted and walked toward the sidewalk, was from 5 to 8 feet from the curb. It was dark and very little light illumined the area. The street there was paved, smooth and virtually level. The curb was a low one. Plaintiff looked at the street where she was walking. It looked "gray . . . dark and shadowy." There was no evidence that the material on which plaintiff slipped was visible to either plaintiff or the driver, or that any other bus had stopped out of the zone because another bus occupied it, or that any person other than plaintiff experienced any difficulty in reaching the sidewalk.

Defendant city contends that there was no evidence of negligence on its part, because (a) there was no evidence that the bus driver knew or should have known of the substance near the gutter; (b) that plaintiff having alighted safely from the bus was no longer a passenger; and (c) under the circumstances, stopping 5 to 8 feet from the curb is not negligence.

(a) · *Knowledge of Driver.*

█ Plaintiff contends that the liability of the city on this feature of the case is not dependent upon knowledge of the driver, but upon knowledge of the city itself, the city having been charged in the complaint with negligent operation of its bus system. From 4:30 to 8 p. m., the time when the jury could have found the material was on the street, approximately 10 bus drivers drove in and out of this zone. Between 7 and 8 p. m. two inspectors were on duty in that district watching to see that the buses ran and that "everything was O. K." Plaintiff contends that the jury could reasonably have inferred that during this time some of these persons must have seen the deposited material, should have reported it to their superiors, and that the latter should have communicated the information to all bus drivers using this zone, including the driver of plaintiff's bus. This is a far-fetched theory. To require bus drivers or inspectors, assuming they had noticed the condition, to report material such as that

here on the street outside bus zones and which in no way would interfere with the normal operation of the buses, would be not only impractical but an unwarranted time-consuming matter.

(b) *Bus Carrier's Duty to Alighting Passengers.*

The city contends that the high degree of care required of a carrier toward a passenger ends when the passenger safely alights from the bus and that the carrier is not responsible for injuries occurring thereafter from the condition of the street which the person must traverse to reach the sidewalk. This is the rule established as to streetcars by such cases as *Choquette* v. *Key System Transit Co.*, 118 Cal.App. 643 [5 P.2d 921], and *McAlpine* v. *Los Angeles Ry. Corp.*, 67 Cal.App.2d 486 [154 P.2d 911].

The city concedes that the above rule does not apply if the passenger while in the act of alighting from the bus is injured. *Maxwell* v. *Fresno City R. Co.*, 4 Cal.App. 745 [89 P. 367], *Boa* v. *San Francisco-Oakland Term. Rys.*, 182 Cal. 93 [187 P. 2], and other cases, so hold. Plaintiff contends that the testimony of Katherine Claymore, if believed by the jury, would bring this case within the rule last mentioned. She estimated that it was around 5 feet from the bus step to the curb. She saw plaintiff fall, and that the material in the street was about 3 feet out from the curb. She further testified as follows: "Q. . . . How far was she from the bus when she fell? In other words, how many steps had she taken from the side of the bus or the step of the bus? A. I think she had just stepped off the bus, because it happened like that. Q. In other words, as she stepped from the step of the bus onto the street pavement, she fell? A. I believe so. Q. Did she fall onto the step of the bus? A. No, not as far as I remember. Q. In other words, it is your testimony that she took no step from the bus, but just as she stepped off the step of the bus, from which you both were alighting, she fell. Is that your testimony? A. When she put her foot down in the mortar. Q. Could you see the mortar from where you were? A. No, I did not." After plaintiff fell the witness looked to see what could have caused her to fall. "She saw the substance about 3 or 4 feet out from the curb. With her hands, she indicated about 3 feet."

In view of plaintiff's own testimony and that of the other witnesses that plaintiff did not fall as she stepped from the bus, the witness Claymore's vagueness in the above quoted testimony as to whether plaintiff fell while alighting, and

her positive testimony that plaintiff slipped "When she put her foot down in the mortar" and that the mortar was 3 or 4 feet out from the curb, while the bus step was around 5 feet from the curb, such testimony would not justify a finding that plaintiff stepped directly from the bus into the mortar, and would not justify the application of the rule of the Maxwell case.

(c) *Bus Stopping Away From Curb.*

█ The mere fact of stopping away from the curb but as near thereto as practicable under the circumstances, was not negligence. In these days of congested streets and of constant complaints of the slowness of our street transportation system, to hold that a bus must always stop at the curb is neither realistic nor practical. Passengers·become impatient with delay, and had the bus driver waited for the preceding bus to pull out there would undoubtedly have been considerable grumbling on their part. Streetcars which move in fixed tracks let their passengers out into the hazards of traffic and such passengers must traverse the street from the tracks to the sidewalk, taking their own chances on the condition of the street, provided only that the place of alighting is safe. While, of course, buses, different than streetcars, can approach the curb and hence should not discharge their passengers out in the street where there is danger of their being hit by passing vehicles (see *Cleveland Ry. Co.* v. *Crooks* (1932), 125 Ohio St. 280 [181 N.E. 102]; *O'Malley* v. *Laurel Line Bus Co.* (1939), 311 Pa. 251 [166 A. 868]; *Paris* v. *East St. Louis Ry. Co.*, 275 Ill.App. 241) nor near known dangers from the condition of the street, there is no compelling necessity requiring that under all conditions they must discharge at the curb.

In the following cases it was held that the bus carrier was not negligent in stopping away from the curb: *Cleveland* v. *Danville Traction & Power Co.*, 179 Va. 256 [18 S.E.2d 913, 915] (usual stopping place occupied by an automobile); *Perret* v. *George*, 286 Pa. 221 [133 A. 228] (stop made beyond usual stopping place because of a building operation at corner); *Sims* v. *Chicago Transit Authority*, 351 Ill.App. 314 [115 N.E.2d 96] (stop short of usual place because of traffic tie-up). The fact that the vehicle occupying the zone was one of defendant's buses does not change the rule. This was a transfer point and the end of the line. It would be impossible to operate a bus line without some occasional delay not only at transfer points but at any stopping place.

A controversy arose over whether plaintiff offered in evidence section 208, Municipal Code. In her opening brief plaintiff stated she read it in evidence. Defendant contends she did not. On appeal, plaintiff made a motion to augment the record by including, among other matters, said section. In her motion plaintiff stated that "apparently" the section was not read. As it does not appear in the record, we denied the motion. Hence the section may not be considered by us.

General Bulletin No. 911 of the municipal railway, introduced in evidence by plaintiff, requires that buses must stop at curb for the purpose of loading and unloading unless "parked vehicles occupy zone." As there was a parked vehicle occupying the zone, there was no violation of this rule.

The cases cited by plaintiff are not contrary to the rule above set forth. They are cases in which the driver made no effort to stop his bus near the curb but stopped it in the street, well knowing of the dangerous situation into which he was precipitating the passenger. In *Cleveland Ry. Co.* v. *Crooks, supra,* 181 N.E. 102, the bus passenger was let off 10 feet from the curb and was hit by a motor vehicle passing the bus to its right. In her complaint the plaintiff alleged, among other matters, negligence of the bus driver in opening the exit door and letting her out in the street without knowing whether approaching vehicles rendered the situation dangerous to alighting passengers. The court stated (p. 103) : "We are in accord with the law that the relation of carrier and passenger ceases when the person of the passenger parts company with the carrier's vehicle . . ."

In *O'Malley* v. *Laurel Line Bus Co., supra,* 166 A. 868, on a dark and stormy night the driver stopped the bus about 250 feet from the place where the plaintiff had asked to be let off, and instead of being on the right side of the street at the curb was in the center of the street about 15 feet from the curb. Almost immediately upon alighting plaintiff was struck by an automobile coming in an opposite direction to that of the bus. The reviewing court reversed a judgment in favor of the defendant similar to a judgment on motion for nonsuit. Its grounds for reversal were (p. 869) : "If the person in charge of a car used for the carriage of passengers for hire knowingly permits one of them to get off the vehicle at a dangerous place, which is not the usual stopping place, and the dangerous character of which the passenger could not see and did not know, the carrier will be liable for the resulting injuries, if any, to the passenger."

Again, in *Paris* v. *East St. Louis Ry. Co., supra,* 275 Ill. App. 241, the bus for no apparent reason stopped 100 feet beyond the regular bus stop in the middle of the street, in the path of traffic at night and no apparent reason why the bus could not have stopped at the curb, and the passenger while walking from the bus to the curb was struck by a passing automobile. The court held that under those circumstances it was a question of fact for the jury "whether proper care for the safety of passengers requires that a particular bus should be driven to the curb when it is reasonably convenient to do so on a particular occasion." (P. 246.)

*O'Shea* v. *Chicago Motor Coach Co.,* 328 Ill.App. 457 [66 N.E.2d 482], was a case in which the bus, although no reason was shown for not stopping at the curb, at night stopped about 90 feet beyond the usual stopping place, and 10 to 15 feet from the curb. The plaintiff as she stepped down from the bus stepped into a crevice in the street and was immediately thrown. The court applied the following rule found in 1 Nellis on Street Railways, 2d ed., section 308: " 'In case of a passenger injured in alighting from a street car owing to the condition of the street, it is said that liability exists when the dangerous condition of the street is known, or could have been known to the street railway company, but is unknown to the alighting passenger, unless he is warned or assisted to a safe place.' " It then held that as the defective condition of the street had existed "for a considerable period of time," (p. 485 [66 N.E.]) and that as the defendant operated buses up and down that particular street many times daily, during daylight hours, it is a reasonable inference that it knew, or should have known of the dangerous condition of the street.

The judgments in favor of defendant Filippi, the bricklayer, and defendant City and County of San Francisco, are affirmed. The judgments in favor of defendant D'Amico, the plasterer, and defendants Barsotti and Bernardini, the general contractors, are reversed.

Peters, P. J., and Wood, (Fred B.), J., concurred.

A petition of Respondents Barsotti and Bernardini for a rehearing was denied September 24, 1954, and the petitions of said Respondents and of Appellant MacLean for a hearing by the Supreme Court were denied October 20, 1954. Carter, J., and Schauer, J., were of the opinion that the petitions should be granted.